CHANDLER *v.* GEORGIA CHEMICAL WORKS *et al.*

No. 11236. APRIL 17, 1936. REHEARING DENIED MAY 15, 1936:

*G. P. Martin* and *Pemberton & W. J. Cooley,* for plaintiff.
*Hamilton Phinizy, S. J. Smith, H. W. Dent,* and *Erwin, Erwin & Nix,* for defendants.

GILBERT, Justice. Isaac Chandler filed his petition against Georgia Chemical Works and W. B. Burns, to cancel a warranty deed from Chandler to Burns, dated March 22, 1922, and a security deed from Burns to Georgia Chemical Works, dated March 24, 1922, as clouds on the title of the petitioner to lands described in the petition. Georgia Chemical Works answered and filed a cross-petition seeking judgment for the indebtedness due to it on the security deed from Burns, and praying for a special lien on the lands in controversy. Burns died pending the litigation, after making no answer but filing a plea of bankruptcy. C. T. Storey Jr., as administrator of his estate, was substituted in his stead as a party. It was alleged in the petition, that the deed from Chandler to Burns was made for the purpose of enabling Burns to obtain a ten-year loan for the benefit of Chandler, out of which a certain amount due to Burns was to be paid; and that in violation of the trust Burns

conveyed the property to Georgia Chemical Works. Chandler receiving no benefit therefrom; and that Chandler has been continuously in possession of the lands for a long period of years, and still remains in possession. Other allegations will be dealt with hereinafter. After hearing evidence the court directed a verdict against the petitioner, and finding in favor of Georgia Chemical Works on its cross-petition against W. B. Burns and against the land described in the security deed from Burns to Georgia Chemical Works for the full amount of $30,000, with interest, to be a special lien on the land superior to any claim of the petitioner, but not to be a personal judgment against W. B. Burns or his representative, Burns having been discharged in bankruptcy before the trial. A decree of the court was thereupon entered. The petitioner filed a motion for new trial upon the general grounds, and by amendment added special grounds that the court illegally refused to admit in evidence a certain bond for title executed by Burns to Chandler under date of December 31, 1919, covering certain lands, which the petitioner alleges was material to show the right under which he was in possession of the lands in controversy at the time the Georgia Chemical Works accepted the security deed from W. B. Burns; and that the court erred in directing the verdict. The court overruled the motion, and the petitioner excepted.

■ Isaac Chandler had resided on the lands in controversy for more than fifty years. Beginning in a small way, he had been a successful farmer, and at a time when "boom" prices prevailed he bought additional farm lands and incurred a large indebtedness. He had for years reposed implicit confidence in William B. Burns, a stockholder and officer of Williford-Burns-Rice Inc., located at Commerce, Ga. That company "bought his cotton," and he "traded with them." For forty years he sold his cotton to Williford-Burns-Rice Inc. He dealt mostly with "Willie Burns." If Burns said, "Mr. Chandler, you sell your cotton to-day and turn this money over to me," if it was ten thousand dollars he would do it. "He would just turn it over to him to do like he wanted to with it. . . That firm was the only one he ever had any confidence in, and he did the biggest end of the business with Willie Burns." In 1919 or 1920 Chandler delivered around 118 bales of cotton when the price ranged from 35 to 45 cents. So the evidence tends to show. Burns had been born and reared on a neighboring farm,

and Chandler had regarded him as a friend throughout the years. For a long time Chandler, after harvesting his crop, would each year deliver his cotton to Williford-Burns-Rice Inc. He would just drive up and say: "Here is my cotton." So great was the confidence bestowed on Burns that Chandler did not usually direct the sale as to time or price or disposition of the proceeds. His accounts ran from year to year, almost without an accounting except at rare intervals. Chandler bought additional land from Burns in 1919, and executed security deeds on December 31, 1919, and January 5, 1921, conveying the land in controversy to secure an indebtedness of $36,336, and subsequently paid that sum down to less than $7000. Burns had become heavily in debt to his company, Williford-Burns-Rice Inc., and the latter was indebted to Georgia Chemical Works of Augusta, Ga., $28,755. Georgia Chemical Works began to press Williford-Burns-Rice Inc., and the pressure apparently was severe. E. F. Jackson, vice-president of the Georgia Chemical Works, went to Commerce to attend a directors' meeting of Williford-Burns-Rice Inc., and at that meeting he learned of Burns' heavy indebtedness to Williford-Burns-Rice Inc. Georgia Chemical Works, the record indicates, wrote off $8755 from the amount due to it by Williford-Burns-Rice Inc., or, what is the equivalent, it loaned to Burns $30,000, paying him $10,000, and crediting the indebtedness of Williford-Burns-Rice Inc. with $20,000. The payment of $10,000 to Burns, and his assuming an indebtedness of $20,000 due by Williford-Burns-Rice., in addition to the $10,000, was apparently a compromise by which $8755 was forgiven Williford-Burns-Rice Inc., and their account was left in balance. The $30,000 loan and the $10,000 payment to Burns were made for the purpose of securing the $28,755 indebtedness of Williford-Burns-Rice Inc., and the security was Isaac. Chandler's land on which he resided and still resides. Chandler owed nothing to Williford-Burns-Rice Inc. He had executed security deeds to his friend Burns, who was assisting him in his business transactions. These deeds were still outstanding when Burns, as alleged in the petition and not denied by him, advised Chandler to execute to him a warranty deed conveying title to the property in controversy, for the purpose of enabling Burns to obtain a ten-year loan for Chandler's benefit, out of which Chandler was to pay Burns the balance of the purchase-price of the lands bought from Burns, less than $7000.

These transactions made Burns, as a matter of law, the agent of Chandler for the special purpose of negotiating a loan for Chandler. It likewise made Burns a trustee to hold and control the title to the land for the sole purpose above stated, and to receive the money for Chandler. *Smith* v. *Harvey-Given Co.*, ante, 410 (185 S. E. ——). This warranty deed was made on March 22, 1922, and two days later Burns conveyed the same property to Georgia Chemical Works under the circumstances above stated, Chandler receiving no benefit therefrom. At that time Chandler, according to the undisputed evidence, was old, feeble, and probably incapacitated to transact any business. If Burns was entitled bona fide to an absolute conveyance from Chandler, with no reservation between them whereby Chandler might, upon certain conditions, have a reconveyance made to him, the ordinary way in which the transaction would have been handled would have been for Burns to have liquidated in whole or in part his indebtedness to Williford-Burns-Rice Inc. by a conveyance to them. It would seem that he would have been more concerned in squaring his indebtedness directly with his corporation, and then letting that corporation deal with Georgia Chemical Works in a settlement or adjustment of its debt to the latter. But in dealing with Williford-Burns-Rice Inc., he would not only be a trustee and agent of Chandler, if we are to accept the contentions of the plaintiff as to the deed having been executed to Burns in trust, but he would also be an agent and officer of Williford-Burns-Rice Inc. Consequently all information that Burns had as to the trust relation with Chandler, if any, would be chargeable to Williford-Burns-Rice Inc. The question is naturally suggested, whether those reasons caused Georgia Chemical Works to deal directly with Burns, who was not their agent, as they claim, instead of letting the property go through Williford-Burns-Rice Inc. first. Was such the reason for the arrangement whereby Burns was to assume the indebtedness of Williford-Burns-Rice Inc., except for $8755 which was forgiven, and was it the foundation for a possible apprehension that the proposed acquisition by Burns from Chandler of the property in controversy was fraudulent? Did the acceptance of the deed from Burns, who was not their agent, as they claim, put them in a better position defensively than if they had accepted a deed from Williford-Burns-Rice Inc., as assignee of Burns, who was in fact interested in that company as a stockholder

and officer? These are questions pertinent in the inquiry as to bona fides. It appears that one deed executed to Burns by Chandler was unacceptable to Georgia Chemical Works, and that a new one was prepared by its counsel for reasons advanced as follows: Chandler had executed certain security deeds to Burns. They covered the same property involved in the present case, but were given to secure the purchase of other property from Burns some time previously for $36,336, all of which had been paid down to less than $7000.

Georgia Chemical Works recognized that between the time of the execution of the security deeds and the time of the execution of the warranty deed to Burns encumbrances might have been created upon the property, and therefore it was thought desirable, apparently in the absence of any investigation of the title, to have Burns obtain from Chandler a new deed in which it would be provided that the security deeds were not merged in the latter. In that event, if the warranty deed proved worthless or in any way affected adversely, the security deeds on the same property would still be good and have a priority, as recorded deeds, over the subsequent encumbrances, if any, upon the property. The security deeds having been recorded, it might have been ascertained that, the same property being conveyed under the warranty deed, Burns was amply protected as a creditor of Chandler in the sale of the other lands, independently of the warranty deed, Chandler at the time owing Burns a balance of less than $7000, and that amount not then being due. Georgia Chemical Works, being charged with notice of the record of the security deeds to the same property as conveyed by the warranty deed, were thereby constructively put in possession of knowledge of a very impressive fact; and it would seem that the jury should have determined whether or not such 'fact put Georgia Chemical Works upon inquiry. Would not that circumstance naturally arouse in Georgia Chemical Works some curiosity and lead them to investigate why Chandler should do such a thing; and if the investigation had been made, would it not have revealed that Chandler was creating only a trust relationship as to Burns by the execution and delivery of the warranty deed? Is it not unusual that Burns did not also record the warranty deed, and that Georgia Chemical Works was apparently not interested in having it recorded immediately to cut off another possible warranty

deed that could be recorded ahead of Burns' deed, and before Burns could convey to Georgia Chemical Works? They knew, as a matter of law, that even if Burns had a warranty deed, it would lose priority over one executed subsequently but recorded prior to his deed. It had been recognized that intermediate encumbrances might affect the first warranty deed prepared for Chandler's signature. When the revised warranty deed was prepared by their attorney and executed by Chandler, they were satisfied to have it recorded only when Burns' deed had been delivered to them, or, as expressed in the deed from Burns to them, "to be recorded herewith." These are in substance the circumstances under which the paper title to Chandler's land passed to his friend and agent, Burns, and from Burns to Georgia Chemical Works. Knowledge of a fact may be inferred from circumstances, and we think that the circumstances here were such as to require submission to the jury of the question of whether or not Georgia Chemical Works was possessed of sufficient information, in connection with the fact of Chandler's possession of the land, which was admitted, to put them upon inquiry as to the actual facts surrounding the execution and delivery of the deed from Chandler to Burns.

"Possession of land is notice of whatever right or title the occupant has." Code of 1933, § 85-408. In reference to this section it was said in *Hadaway* v. *Smedley,* 119 *Ga.* 264, 268 (46 S. E. 96) : "If it had been a new principle announced for the first time in that Code [of 1895], it might not have applied to some of the transactions in this case; but it is not a new principle and has always been the law in this State, as will be seen by reference to the opinion of Bleckley, C. J., in *Broome* v. *Davis,* 87 *Ga.* 587 [13 S. E. 749], from which this section of the Code was taken." The principle is also found in *Peck* v. *Land,* 2 *Ga.* 1 (2) (46 Am. D. 368), the second headnote of which is: "The possession of property, real or personal, remaining with the vendor after an absolute deed of conveyance, is *an evidence of fraud.*" (Italics ours.) In *Fleming* v. *Townsend,* 6 *Ga.* 103 (50 Am. D. 318), it was held: "Possession retained by the vendor, after an absolute sale of real or personal property, is *prima facie* evidence of fraud, which may be explained, and after the possession is proven, the burthen of explaining it rests upon those who claim under the sale." In that case Judge Nisbet approved the holding of the lower court that

"The possession in the vendor was, under that statute [27 Elizabeth], and also by the principles of the common law, independent of it, *prima facie* evidence of fraud." While this case does not involve the question of defrauding creditors, yet the fundamental principles of notice implied from possession is at the core. The *badge of fraud* is there prima facie, and required one claiming under the grantee to determine by inquiry whether the badge was real or apparent. "The burthen of explaining it rests upon those who claim under the sale." Or, as was said in *Fleming* v. *Townsend, supra*: "*The onus of explanation, after possession is proven, is upon the grantee.*" So it can be seen that from very early times deeds and assignments of property, where the grantor remained in possession, were said to be affected with an infirmity that prevented them from being conclusive. The possession called for inquiry as to the right or title of the occupant in the present case, and opened the transaction to investigation. In such circumstances the grantee assumed the risk of a court declaring his contract void, in the absence of a satisfactory showing that the transaction was bona fide. In *Berry* v. *Williams,* 141 *Ga.* 642 (81 S. E. 881), it was held: "1. A deed absolute in form may be shown to have been made to secure a debt, where the maker remains in possession of the land. *Mercer* v. *Morgan,* 136 *Ga.* 632 (71 S. E. 1075). 2. Actual possession is notice to the world of the right or title of the occupant. *Mercer* v. *Morgan,* supra; *Bridger* v. *Exchange Bank,* 126 *Ga.* 821 (56 S. E. 97, 8 L. R. A. (N. S.) 463, 115 Am. St. R. 118) ; *Austin* v. *Southern Home &c. Asso.,* 122 *Ga.* 439 (50 S. E. 382). 3. Where the owner of land executes a deed of the character mentioned in the first note, and remains in possession of the land, and the grantee conveys the land to another who has no actual notice of the undisclosed agreement that the deed should operate as a security for debt, and who has made no inquiry of the occupant, the latter may pay or tender the amount of the debt to the first grantee and maintain an equitable action against the first grantee and the remote grantee for cancellation of both deeds as clouds upon his title, and to have the title decreed to be in him." It will be noted that in that case there was "actual possession" by the grantor. No other facts or circumstances are shown which would demand an inquiry, except the single fact of possession. We have undertaken to show such facts in the present case as an additional reason for a

reversal of the judgment. See, to the same effect as in the last mentioned case: *Cogan* v. *Christie,* 48 *Ga.* 585; *Franklin* v. *Newsom,* 53 *Ga.* 580; *Broome* v. *Davis,* 87 *Ga.* 584, 587 (supra); *Kent* v. *Simpson,* 142 *Ga.* 49 (82 S. E. 440); *Summerour* v. *Summerour,* 148 *Ga.* 499 (97 S. E. 71); *Waller* v. *Dunn,* 151 *Ga.* 181 (106 S. E. 93); *Sims* v. *Sims,* 162 *Ga.* 523 (134 S. E. 308).

It is contended by the defendant, however, that the present case is not controlled by the foregoing cases, but is controlled by a line of decisions beginning with *Jay* v. *Whelchel,* 78 *Ga.* 786 (3 S. E. 906), and including *Malette* v. *Wright,* 120 *Ga.* 735 (48 S. E. 229); *Peabody* v. *Fletcher,* 150 *Ga.* 468, 479 (104 S. E. 448); *Johnson* v. *Hume,* 163 *Ga.* 867 (137 S. E. 56); *Rimes* v. *Floyd,* 168 *Ga.* 426, 428 (148 S. E. 86). We think it will be found that the case of *Jay* v. *Whelchel,* supra, and the cases following and based upon it, stand upon their special facts. If not, the older cases upon which section 85-408 (supra) is founded must prevail. In *Bridger* v. *Exchange Bank,* 126 *Ga.* 821, 826 (56 S. E. 97, 8 L. R. A. (N. S.) 463, 115 Am. St. R. 118),. it was stated, as to the *Malette* case: "The decision never intended to abrogate the general rule, but merely held that the facts of that case did not fall within it." The two lines of cases have led to some very close decisions. It is worth while to note that Chief Justice Bleckley wrote the decisions in both *Jay* v. *Whelchel* and *Broome* v. *Davis,* from which latter the Code provision was taken. There is no conflict between the two decisions. The principles and lines of argument in the two classes of cases are well stated in 27 R. C. L. 727, 728, §§ 491, 492: "The authorities are not in accord as to the effect of the continued possession by a grantor as notice of rights inconsistent with his grant. A number of the authorities apply in such a case the general rule that possession is notice of all the equitable and other rights of the possessor. The authorities sustaining this view say, that, by the terms of the deed, the grantor has not the right of possession, and that his continuing possession gives notice that he has rights reserved not expressed in the deed; that inasmuch as the records disclose no right of possession, it is but reasonable to conclude that the continuing possession rests upon some right not disclosed by the records, and that the reasonableness of such conclusion imposes upon persons about to deal with the land the duty to make inquiry. There is no good reason, it has

been said, for making a distinction between possession by a stranger to the record title and possession by the grantor after delivery of his deed. In either case the possession is a fact inconsistent with the record title, and if possessor [possession] by the stranger is sufficient to make it obligatory upon a purchaser to ascertain his right, possession by the grantor is a circumstance entitled to equal consideration. An absolute deed divests the grantor of the right of possession, as well as of the legal title, and when he is found in possession after delivery of his deed, it is a fact inconsistent with the legal effect of the deed, and is suggestive that he still retains some interest in the premises. Under such circumstances, a purchaser has no right 'to give controlling prominence to the legal effect of the deed,' in disregard of the other 'notorious antagonistic fact' that the grantor remains in possession just as if he had not conveyed. To say that the grantor is estopped by his deed is begging the question; for, if his possession is notice to third parties of his rights, there'is no principle of estoppel that would prevent him from asserting against purchasers or creditors any claim to the premises which he might assert against his grantee. This is especially true where the grantor's possession has continued for a considerable length of time after his conveyance and is accompanied with the usual acts of ownership. Thus it has been held that where a grantor who has given a warranty deed continues in open and notorious possession of agricultural land at the time of the grant, and for a considerable time thereafter during the cropping season, subsequent purchasers are put on notice and under obligation to make inquiries as to his rights and equities in the land, unless he has, either expressly or by a recognized course of dealing, held out his grantee as authorized to convey. In pursuance of the above view it is held that where an absolute deed intended as security is given or where a separate instrument of defeasance is taken and not recorded, the continued possession of the grantor is constructive notice of the true character of his conveyance and his consequent equity of redemption. . . Opposed to the view announced in the preceding paragraph, other cases take the view that a purchaser is justified in relying on the ostensible title conferred by the deed, and the inference that the grantor's possession is merely permissive and not in antagonism to his grant, and therefore that his continued possession is not notice of other rights. For as has been

said, a solemn deed is the equivalent of an assertion by the party grantor that the title is in the grantee; its purpose is to convey and show title, and he who thereby invests another with this universally recognized evidence of right ought not, as against one who deals with that other upon the faith of such evidence, to be permitted to aver to the contrary to his injury. This has been held true where the grantor remaining in possession acquired his rights through a transaction not contemporaneous with but subsequent to his conveyance. In these jurisdictions, however, it seems that if the grantor's possession is continued for a considerable length of time, it may then be such as to impart notice of rights inconsistent with his conveyance."

In several cases dealing with the principle that possession is notice, etc., the expression "actual possession" is used. "Actual possession" does not necessarily imply title in the occupant. A tenant or even a "squatter" may be an occupant. If "possession" such as would constitute notice is restricted to "actual possession," that would be in strict accord with the Code, § 85-408, for by that section the notice is of whatever right the *occupant* has. That construction would also be in accord with a number of decisions. The omission of the word "actual" in other cases and in the Code must be attributed to the theory that the word "occupant" in the Code implies a restriction on the word "possession." In the present case Chandler, the grantor of Burns, according to the undisputed evidence is and has continuously been in *actual* possession. There has been no transfer whatever of possession. No inquiry was made as to the apparent inconsistency of the grantor remaining in possession. There were sufficient facts shown by the evidence to authorize the jury to find that Georgia Chemical Works was required to make inquiry. *Chestnut* v. *Weekes*, 180 *Ga.* 701 (180 S. E. 716), and all of the cases cited therein as authority for the judgment were deemed to be exceptions to the general rule, and were "never intended to abrogate the general rule." In the present case the facts bring it clearly within the general rule. "A deed or bill of sale, absolute on its face and accompanied with possession of the property, shall not be proved, at the instance of the parties, by parol evidence to be a mortgage only, unless fraud in its procurement shall be the issue to be tried." Code of 1933, § 67-104. In the present case possession was retained by the grantor. There can

be no question as to the bad faith of Burns, and of the further fact that a court of equity is compelled to grant the relief prayed as against him: It appears that after the petition was filed Burns died, having failed to make any answer denying the allegations, or otherwise, leaving the same, as far as he was concerned, wholly admitted, but filing a plea setting up that he was a bankrupt.

But it is insisted that Georgia Chemical Works is an innocent purchaser, and that one who takes without notice from one who has notice is protected under Code of 1933, § 37-114, which provides: "If one with notice shall sell to one without notice, the latter shall be protected; or if one without notice shall sell to one with notice, the latter shall be protected, as otherwise a bona fide purchaser might be deprived of selling his property for full value." The facts of this case demand a finding, however, that Georgia Chemical Works was put upon inquiry. "Notice sufficient to excite attention and put a party on inquiry shall be notice of everything to which it is afterwards found such inquiry might have led. Ignorance of a fact, due to negligence, shall be equivalent to knowledge, in fixing the rights of parties." Code of 1933, § 37-116. Although Georgia Chemical Works had its attorney to examine the title records of the land, E. F. Jackson, vice-president of the company, testified that he alone represented the company in the transaction, and that no inquiry was made with respect to the occupancy of the land. Georgia Chemical Works took its deed which had been prepared by its attorney after its vice-president had attended the directors' meeting of Williford-Burns-Rice Inc., and had ascertained facts hereinbefore shown, and in the face of the further fact that the possession of Chandler demanded that Georgia Chemical Works inquire into the right of his occupancy. For these reasons the court erred in directing a verdict.

■ It follows that the court erred in not admitting in evidence, as against Georgia Chemical Works, the bond for title from Burns to Isaac Chandler.

■ Because of what is shown above, the court erred in not granting a new trial. *Judgment reversed. All the Justices concur.*